**2022 IL 127584**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 127584)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JODON
COLLINS, Appellee.

*Opinion filed November 28, 2022.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Anne M. Burke, Neville, Michael J. Burke,
Carter, and Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial in the circuit court of Cook County, defendant, Jodon
Collins, was convicted of unlawful possession of a weapon by a felon (720 ILCS
5/24-1.1(a) (West 2016)) and of being an armed habitual criminal (*id.* § 24-1.7(a)).
The circuit court merged the unlawful use of a weapon by a felon count into the
armed habitual criminal count and sentenced defendant to 7½ years in the Illinois

Department of Corrections. On appeal, defendant challenged his conviction on the basis that, *inter alia*, the State improperly presented audio recordings from a body-worn camera that were subject to exclusion as hearsay statements. See Ill. R. Evid. 802 (eff. Jan. 1, 2011). On this basis, the Appellate Court, First District, reversed defendant's conviction and remanded for a new trial. 2020 IL App (1st) 181746.

¶ 2 We granted the State's petition for leave to appeal (PLA) pursuant to Illinois Supreme Court Rule 315 (eff. Oct. 1, 2020). In its PLA, the State raised the issue of whether the Law Enforcement Officer Body-Worn Camera Act (Act) (50 ILCS 706/10-1 *et seq.* (West 2016)) "provides that relevant body-worn camera recordings are admissible without limitation and, in any event, [whether] such recordings are *** hearsay." The State argued that such "audiovisual recordings are not hearsay and are admissible provided they are relevant and properly authenticated." For the following reasons, we dismiss the appeal.

¶ 3 I. BACKGROUND

¶ 4 Chicago police officers Martin Hernandez and Joel Lopez were on patrol shortly after 1 a.m. on December 16, 2017. As they turned onto Walnut Street, they saw a group of three people standing near 3300 West Walnut Street. The group looked in the officers' direction and started walking away from them. As the officers approached 3300 West Walnut Street, Hernandez got out of the car to "conduct an investigation."

¶ 5 Hernandez saw one member of the group, whom he identified as defendant, turn around and immediately start running. Before defendant ran, Hernandez did not see defendant holding a gun and did not see a bulge in defendant's pants. Defendant ran through a vacant lot, "holding his left side," with Hernandez five to eight feet behind. From that distance, Hernandez saw defendant "drop a black handgun" on the ground.

¶ 6 Hernandez, after hesitating on seeing the gun, kept chase. Once defendant jumped multiple fences into the yard of a house on Fulton Street, Hernandez lost sight of him. Hernandez went into the backyard and found defendant "crouched down" against the wall of the house. Hernandez arrested defendant and handed him

off to other officers before going back to the vacant lot, where he recovered a black handgun in the area where he saw defendant drop it.

¶ 7 Hernandez wore a body camera. To activate his body camera, he twice pushed a button on the front of it. Once activated, the camera captures "a 15-second period that it goes back and records." Over an objection from defendant's counsel, the court allowed the State to play video footage with the audio. The video starts as Hernandez runs toward the fence area because, as Hernandez explained it, when the chase began, his "focus was on the person that's fleeing." Hernandez agreed that a Chicago Police Department special order required him to start the camera at the beginning of an incident and "leave it recording till the scene is safe."

¶ 8 During the video, Hernandez made the following statements on his radio, after putting defendant in custody:

"Get to that lot, dude. Hurry up. He dropped it there."

"Go back to the lot where he ran through, dude. It's right in the middle of the lot. It's black."

"It's a pistol, squad. He dropped a pistol right there in the middle of the lot over there where it started."

Before trial, defendant's counsel had moved *in limine* to bar the video, arguing that the statements it contained constituted hearsay and improper prior consistent statements. The circuit court denied the motion, overruled counsel's objection to the video, and overruled counsel's objection to the video when the court formally admitted it into evidence.

¶ 9 Chicago police evidence technician Robert Franks analyzed the gun for fingerprints but found none. The State admitted certified copies of two prior convictions for possession of a controlled substance with intent to deliver.

¶ 10 Defendant did not testify. His counsel called Sergeant Joel Lopez, who laid the foundation for the admission of his body camera video. Lopez explained that his video starts after Hernandez had already gotten out of the car. The video shows Lopez driving for a while, eventually getting out of his car, and searching

unsuccessfully for the gun. Defendant's counsel played the video for the jury, without objection by the State.

¶ 11     During closing argument, the State discussed Hernandez's body camera video, rhetorically asking the jury how Hernandez could have directed his fellow officers back to the lot where they found the gun if he had not seen defendant drop it there. The State then played the entire video for the jury. Defendant's counsel played Lopez's body camera recording for the jury, arguing that Hernandez's instructions to go back to the lot (audible in both officers' body camera videos) were confusing because it took Lopez so long to get to the right area.

¶ 12     The jury found defendant guilty of unlawful use of a weapon by a felon and being an armed habitual criminal. Defendant filed a motion for a new trial, repeating the argument that the audio portion of the video from Hernandez's body camera was improperly admitted. The circuit court reiterated its view that the videos were "obviously admissible" and denied the motion for a new trial. In sentencing, the circuit court merged the unlawful use of a weapon by a felon count into the armed habitual criminal count and sentenced defendant to 7½ years in the Department of Corrections.

¶ 13     Defendant appealed, again arguing that the circuit court erred in admitting the audio portion of the video from Hernandez's body camera because it exposed the jury to " 'inadmissible hearsay.' " 2020 IL App (1st) 181746, ¶ 14. The appellate court reviewed the Act, noting that body-worn camera " 'recordings may be used as evidence in any administrative, judicial, or disciplinary proceeding.' " *Id.* ¶ 22 (quoting 50 ILCS 706/10-30 (West 2016)). The appellate court found that "the word 'may' permits trial courts to exclude body-worn camera recordings where appropriate." *Id.* ¶ 24. The appellate court held that the word " 'evidence' must be subject to the Illinois Rules of Evidence applicable to criminal cases." *Id.* ¶ 26. Concluding that ignoring rules of evidence would lead to an absurd result, the appellate court held that the Act does not allow the admission of body-worn camera video without evidentiary limitation. *Id.* ¶¶ 28-30.

¶ 14     The appellate court also concluded that it could not "accept that Hernandez's statements in the body camera video were admitted for anything but the truth of the matter [they] asserted—namely, that the black gun was in the lot through which [defendant] ran and that [defendant] dropped it there." *Id.* ¶ 34. The appellate court

noted that Hernandez repeated the relevant hearsay statements in some form at least three times throughout the video, the State relied on the hearsay statements during its closing argument, and the State replayed the video in full. *Id.*

¶ 15    Upon reviewing the video, the appellate court held that "it is of the type to easily overpersuade." *Id.* ¶ 37. It characterized the video as "depict[ing] a chase at night, with frenetic movements caused by the camera's attachment to Hernandez's body" with "Hernandez call[ing] over the radio in an urgent tone of voice, while he is breathing deeply from the chase." *Id.* The appellate court noted that "[t]he video shows at least two police SUVs had responded to the scene with searchlights" and "[f]our officers, at minimum tak[ing] [defendant] into custody." *Id.* The appellate court concluded that, because no nonhearsay purpose justified the admission of the video's audio portion with Hernandez's out-of-court statements, the nature of the video became more prejudicial than probative. *Id.*

¶ 16    The appellate court determined that it could not conclude that admitting the hearsay statements in the body camera video was harmless beyond a reasonable doubt. *Id.* ¶ 45. The appellate court noted that "[t]he State's theory of the case focused on Hernandez's statements in the body camera video as essential corroboration to his testimony that he saw [defendant] drop the gun in the lot during the chase." *Id.* The appellate court held that Hernandez's testimony was minimally sufficient to support the conviction, considering that Hernandez's testimony was not corroborated and an evidence technician recovered the gun and found no latent prints on the firearm, firearm magazine, or the rounds of ammunition. *Id.* ¶ 47

¶ 17    Justice Coghlan dissented, opining that the body camera evidence was not hearsay and was admissible under the unambiguous language of the Act and as a properly authenticated taped conversation or recording. *Id.* ¶ 57 (Coghlan, J., dissenting).

¶ 18                                     II. ANALYSIS

¶ 19    In its PLA, the State asserted that review of this case by this court was necessary to address whether the Act "provides that relevant body-worn camera recordings are admissible without limitation and," in any event, whether "such recordings are not hearsay." The State argued that the Act "does not distinguish between the audio

and video components of the recordings and does not purport to bar hearsay evidence." We granted leave to appeal to answer this question.

¶ 20 However, in its briefing for this court, the State did not address this question. At oral argument, the State conceded that it had abandoned the original issue presented in its PLA—that the Act renders the body camera audio recordings automatically admissible and that recorded conversations were not hearsay on the basis that they were recordings. The State has thus abandoned the position originally taken in its PLA that the recording was admissible without regard to evidentiary limitations. The State concedes that the Act may be read consistent with the Illinois Rules of Evidence.

¶ 21 Instead, the State now argues that the statements were not hearsay or were admissible pursuant to course-of-investigation or excited-utterances exceptions. In the appellate court, the State argued that the statements in the body camera video were not hearsay and, in the alternative, were admissible as excited utterances. 2020 IL App (1st) 181746, ¶ 20. The appellate court noted, however, that the State had abandoned the argument that the hearsay statements were admissible as excited utterances, by only asserting on appeal that the statements in the video were not hearsay. *Id.* Moreover, neither exception now raised by the State was raised in the State's PLA to this court. Indeed, the State has failed to argue the threshold question presented to this court through its PLA and upon which we granted leave to appeal. Accordingly, we hereby dismiss the appeal. See *People v. Robinson*, 223 Ill. 2d 165, 174 (2006).

¶ 22 III. CONCLUSION

¶ 23 Based on the record before us and the State's failure to argue the issue upon which we granted leave to appeal, we dismiss this appeal. We remand this cause to the circuit court for a new trial.

¶ 24 Appeal dismissed.

¶ 25 Cause remanded.