2023 IL App (1st) 210994-U

SIXTH DIVISION
January 27, 2023

No. 1-21-0994

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 MC3 000110 |
| | ) | |
| THOMASA DE LA ROSA, | ) | The Honorable |
| | ) | Ketki Shroff Steffen, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Justices C.A. Walker and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction for battery over her contention that the trial court plainly erred by providing inadequate admonishments prior to accepting her jury waiver, and we reject her argument that she was denied effective assistance of trial counsel.

¶ 2    Following a bench trial, defendant Thomasa De La Rosa was found guilty of two counts of battery (720 ILCS 5/12-3 (West 2018)) and sentenced to 14 days in the Cook County Department of Corrections and one year of conditional discharge. On appeal, De La Rosa contends that the trial court accepted her jury waiver without providing adequate admonishments and ensuring that her waiver was knowing and voluntary. She also contends that she was denied

effective assistance by defense counsel's use of body camera footage that supported the State's case. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4     De La Rosa was charged by complaint with two counts of battery following an October 15, 2018, incident involving complainant A.P.[1].

¶ 5     On June 28, 2019, De La Rosa was in court with her attorney when the trial court stated that the case was continued, and a bench trial was indicated. On December 16, 2019, De La Rosa was present when an assistant public defender appeared for defense counsel and asked to set the case for a bench trial, in response to which the trial court scheduled a bench trial on March 5, 2020. On September 25, 2020, De La Rosa was present with counsel when the trial court stated that the case was "up today for a bench trial," but the case was continued. At the next court date, De La Rosa was present with her attorney when the trial court stated that the case was set for a bench trial, but the case was then continued again.

¶ 6     On May 25, 2021, the trial court asked for De La Rosa's jury waiver. The trial court then explained the charges and possible penalties and asked whether De La Rosa understood. De La Rosa stated that she did. The trial court then asked De La Rosa if her signature appeared on the jury wavier and De La Rosa answered in the affirmative. The trial court explained that a jury consists of 12 people selected by defendant, defense counsel, and the State, and that all 12 would have to find De La Rosa guilty beyond a reasonable doubt. The trial court then asked whether De La Rosa "understood the nature of the charges" and De La Rosa answered affirmatively. The record contains De La Rosa's signed jury waiver dated May 25, 2021. The document states that

---

[1]Because the complainant was a minor, we elect to refer to her by her initials.

"the undersigned [(De La Rosa)], do hereby waive jury trial and submit the above entitled cause to the Court for hearing."

¶ 7    A.P. testified that on October 15, 2018, she attended Larkin High School in Elgin and played in a "powder puff," inter-grade football game. After the game, as A.P. was looking for her coach, De La Rosa—whom A.P. identified in court—came onto the field, put her hand in A.P.'s face, and would not let A.P. "get past." A.P. had not spoken or gestured toward De La Rosa. De La Rosa's hand was six inches from A.P.'s face. De La Rosa told A.P. not to say anything to De La Rosa's daughter, called her a "b***," and hit her. A.P. hit De La Rosa back, and De La Rosa pulled A.P.'s hair. De La Rosa's daughter, Ni. G., then "ran up" and punched A.P.[2] A.P. believed that one of De La Rosa's other daughters was also involved. The incident lasted a few minutes, during which De La Rosa and her daughters punched A.P. in the face. After school administrators stopped the fight, A.P. was involved in a second fight. She was later taken to a hospital and diagnosed with a concussion. A.P. identified photographs of her injuries, stating that De La Rosa scratched her cheek and caused bruising underneath her eye. Additionally, A.P.'s nails were "broken off."

¶ 8    The parties stipulated to the foundation of several photographs and that they accurately depicted A.P.'s injuries. These photographs were entered into evidence and are included in the record on appeal. They depict a young African-American woman with a scratch to her left cheek that runs from her eye to the edge of her nostril. Another photo shows a hand with painted acrylic nails and blood on the middle, ring, and pinky fingers. The final photograph depicts a bloody pinky nail missing a painted fingernail, and the other fingers' acrylic nails broken at the fingertips.

---

[2]For clarity, we will refer to De La Rosa's daughters, who were minors at the time, as Ni. G. and Na. G.

¶ 9    During cross-examination, A.P. denied participating in "trash talk" before the game. Although her team lost, she was not upset or yelling. She denied that she and her teammates surrounded Ni. G., and that De La Rosa separated them. A.P. hit De La Rosa after De La Rosa hit her. She did not remember telling a police officer that she punched De La Rosa more than twice but less than five times. Three fights took place after the game.

¶ 10    De La Rosa testified that in 2018, her daughters Ni. G. and Na. G. attended Larkin High School. Ni. G. was a senior and Na. G. was a sophomore, and both girls played on their class powder puff football teams. The final game on October 15, 2018, was the sophomores versus the juniors. The sophomores were the underdogs but won the game. De La Rosa, along with other adults, went to the field to congratulate the team and take pictures.

¶ 11    Once on the field, De La Rosa saw a group of 20 juniors "having words" with Ni. G. De La Rosa approached, told them to stop, and instructed Ni. G. to join her friends elsewhere. When De La Rosa turned around, she was hit twice in the face and "buckled" at the knees. She remembered who hit her but did not know the girl's name at that time. De La Rosa was later told A.P.'s name. Ni. G. returned and began fighting with A.P.; a larger fight then began.

¶ 12    De La Rosa approached a police officer and stated that a girl struck her on the field. The officer told De La Rosa to leave until the fight was under control. As De La Rosa left, she encountered the school's dean and told him that she was struck by a child. The officer approached De La Rosa and stated that he told her to leave the field. De La Rosa identified the person who struck her to the dean and was told to leave the field while things "de-escalated." De La Rosa did not put her hands in anyone's face, touch anyone, or pull anyone's hair.

¶ 13    During cross-examination, De La Rosa acknowledged telling a police officer that Ni. G. and A.P. fought. She denied stating that the "African-American" girl " 'swung' " at her, and they

" 'both got up to fighting with each other.' " She was not angry when she saw A.P. having words with Ni. G.; rather, she was concerned for their safety. Although De La Rosa approached A.P., she remained six feet away.

¶ 14    During redirect, De La Rosa agreed that she told the officer that " 'The African-American girl then swung on [Ni. G.][3], and they both got to fighting with each other.' "

¶ 15    Ni. G. testified that she went to the field to cheer for her sister. After the sophomores won their game, members of the other team, including A.P., were "aggressive." The first time Ni. G. saw A.P., A.P. was hitting De La Rosa. A.P. "cocked her hand back" and struck De La Rosa with a "full fist," causing De La Rosa to fall. De La Rosa did not touch anyone prior to falling. Rather, she stood between the groups. After De La Rosa fell, there was no other physical contact between De La Rosa and A.P. Ni. G. approached A.P. and asked if A.P. hit De La Rosa. A.P. stated she did and then punched Ni. G. in the face. Ni. G. hit back. After teachers separated the girls, A.P. "came at" Ni. G. a second time.

¶ 16    During cross-examination, Ni. G. denied that De La Rosa hit A.P. Ni. G. did not recall how many times she hit A.P. De La Rosa was initially in the stands and then went to the field.

¶ 17    The defense entered body camera footage from a police officer that defense counsel argued supported De La Rosa's and Ni. G.'s testimony. The footage was admitted, published, and is included in the record on appeal.

¶ 18    This court has reviewed the footage, which is approximately 13 minutes and 29 seconds long. The first 30 seconds lack audio and visual components. The audio component begins at 31

---

[3]Although not clear from the transcript, based on De La Rosa's testimony, we infer that she was referring to Ni. G.

seconds and the visual component begins at 2 minutes and 43 seconds. The sound cuts in and out, with constant screaming, yelling, and multiple voices in the background.

¶ 19    Initially, in the portion of the video that only contains an audio component, a male voice yells "stop" several times, "get off the field," and "knock it off." Another voice says, "jumped her." The male voice says, "get off the field" and "wait over there for me please." A female voice says, "where's [Ni. G.]," and another female voice says, "I don't know where my sister is." The male voice says, "wait over there" and "we will handle it." A female voice replies, "not handled when she just got [inaudible] by 10 different people." A voice says, "the mom hit first." Then a male voice says, "hey, you need to go now" and "stop." Another voice says, "that's a parent and she cold cocked her three times in the face [inaudible] that student." The male voice says, "calm down." A voice says, "she over there." Then someone screams, "Mom" repeatedly. A voice says, "here they go again." There is additional screaming and a male voice yells, "stop."

¶ 20    When the visual component of the video begins, a football field and track are depicted, and people are milling around. A woman says, "my daughter is upset." A.P. says, "someone pulled my hair." A.P. is held by a woman, as A.P. screams "no" repeatedly. As an older woman and others try to comfort A.P. and say "relax," A.P. yells, speaks incoherently, stumbles, and cries. Although A.P. says she is fine, an ambulance is called. At one point a voice says, "that parent jumped on four kids."

¶ 21    In closing argument, the State argued that it was incredible that De La Rosa never struck A.P., noting that in the video A.P. was crying in her mother's arms. Moreover, De La Rosa admitted to leaving the stands and being in an altercation with high school students. The defense responded that De La Rosa denied any physical contact with A.P. and that De La Rosa's and Ni. G.'s version of events was credible and unimpeached.

¶ 22    The trial court then asked whether the video depicted one of De La Rosa's daughters beating A.P., and defense counsel answered in the negative. The trial court then noted that on the video, A.P.'s mother indicated that her daughter had been hit " 'again' " by someone else. Defense counsel replied that was the "point," namely, that multiple people were involved in multiple fights. Defense counsel asserted that A.P. was the "initial instigator," and that the video did not depict De La Rosa or her daughters instigating the fight. The trial court clarified that the video did not begin until after the alleged contact between A.P. and De La Rosa ended, and asked whether De La Rosa was arrested for "no reason." Defense counsel replied that "it happens all the time." After the trial court stated there was "no doubt" that multiple people hit A.P., defense counsel argued that none of the others were arrested or identified, and their actions should not be "impute[d]" to De La Rosa.

¶ 23    In rebuttal, the State argued that it did not make "any sense" for A.P. to fabricate that De La Rosa hit her. Ni. G. admitted to hitting A.P. multiple times, and De La Rosa's explanation that she went to the field to take photographs was incredible.

¶ 24    In finding De La Rosa guilty, the trial court noted the "animosity" after the sophomores won the game and found it incredible that this animosity became hostile a "split second" after De La Rosa went to the field. The trial court did not find De La Rosa or Ni. G. credible, noting that when De La Rosa told an administrator she was struck, he told her to leave, but De La Rosa did not comply. The trial court had "no doubt" that De La Rosa battered A.P., as De La Rosa's testimony did not "jibe." The trial court did not believe that De La Rosa went to the field to "just to take a picture," and, even if she did, the situation soon turned hostile. Although the trial court believed that A.P. was "egging" people on, she did not deserve to be beaten. De La Rosa filed a motion for a new trial and a motion to reconsider, which were denied.

¶ 25    At sentencing, the State argued in aggravation that De La Rosa had a 2000 felony conviction for theft by deception and five misdemeanor convictions. In mitigation, defense counsel argued, in relevant part, that De La Rosa's criminal background was "at least 20 years old," except for one traffic offense.

¶ 26    The trial court imposed a sentence of 14 days in the Cook County Department of Corrections and 1 year of conditional discharge. De La Rosa did not file a motion to reconsider sentence.

¶ 27                                II. ANALYSIS

¶ 28    On appeal, De La Rosa first contends that the trial court violated her constitutional rights to a jury trial and to due process of law when it accepted her jury waiver without providing adequate admonishments. She argues that the trial court's "fleeting" and "perfunctory" admonishments fail to establish that she knowingly, voluntarily, and intelligently waived her right to a jury trial. Although she acknowledges her signed jury waiver, she asserts that this document does not compensate for inadequate admonishments. De La Rosa acknowledges that she did not preserve this issue for review and asks this court to review it under the second prong of the plain error rule.

¶ 29    The State responds that no error occurred, and moreover, the record establishes that De La Rosa's waiver was knowing and voluntary when the parties repeatedly discussed the case proceeding to a bench trial in De La Rosa's presence without any objection from De La Rosa. The State also argues De La Rosa signed a jury waiver, which she confirmed in open court, the trial court gave her sufficient admonishments, and De La Rosa's criminal background demonstrated her familiarity with her right to a jury trial.

¶ 30    Under the plain error doctrine, we may review unpreserved error when an error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." (Internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). "Whether a defendant's fundamental right to a jury trial has been violated is a matter that may be considered under the plain error rule." *People v. Bracey*, 213 Ill. 2d 265, 270 (2004). A defendant bears the burden of persuasion under both prongs. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Because there can be no plain error without error, we must first determine whether error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 31    The right to a jury trial is a fundamental right guaranteed by the federal and state constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13; see also *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). Although the right to a jury trial is fundamental, a defendant may waive that right. *Bracey*, 213 Ill. 2d at 269. To be valid, however, a defendant's waiver "must be knowingly and understandingly made." *Id.*; 725 ILCS 5/103-6 (West 2018) ("[e]very person accused of an offense shall have the right to a trial by jury unless *** understandingly waived by defendant in open court").

¶ 32    There is no formulaic admonishment that a trial court must provide before accepting a jury waiver; the validity of a waiver depends on the facts and circumstances of each case. *Bannister*, 232 Ill. 2d at 66. A written jury waiver, as required by section 115-1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-1 (West 2018)), "is one means by which a defendant's intent" to waive the right to a jury trial "may be established"; however, it is not "always" dispositive of a valid waiver. *Bracey*, 213 Ill. 2d at 269-70. Moreover, a reviewing court may consider a

defendant's silence when defense counsel requests a bench trial, and the defendant's "prior interactions with the justice system." *People v. Reed*, 2016 IL App (1st) 140498, ¶ 7.

¶ 33     The critical determination is whether a defendant waived the right to a jury trial with the understanding that "the facts of the case will be determined by a judge and not a jury." *Bannister*, 232 Ill. 2d at 69. A defendant has the burden to establish that his or her jury waiver was invalid. *Reed*, 2016 IL App (1st) 140498, ¶ 7. We review whether a defendant knowingly waived the right to a jury trial *de novo. Id.*

¶ 34     In the case at bar, the particular facts and circumstances support the finding that De La Rosa's waiver of her right to a jury trial was knowing and voluntary. Initially, the record reveals that defense counsel stated that De La Rosa wished to proceed by way of bench trial multiple times in De La Rosa 's presence and De La Rosa never objected or asked questions. See *id.* ("a present defendant's silence while his or her attorney requests a bench trial provides evidence that the waiver is valid"). Additionally, De La Rosa submitted a jury waiver indicating she did not wish to have a jury trial. See *People v. Gatlin*, 2017 IL App (1st) 143644, ¶ 14 ("Although not dispositive of a valid waiver, a written waiver may provide evidence that the defendant knowingly relinquished his right to a jury trial."). The trial court first explained the charges and possible penalties, and De La Rosa confirmed that she understood them. The trial court then asked De La Rosa if her signature was on the jury waiver; she stated it was. The trial court next stated that a jury consists of 12 people selected by De La Rosa, defense counsel, and the State, and that all 12 would have to find De La Rosa guilty beyond a reasonable doubt. De La Rosa stated she understood.

¶ 35     De La Rosa is correct that the trial court did not explain that in a bench trial the facts of the case are determined by the judge and did not ask whether the waiver resulted from threats or

promises. However, the trial court did explain that in a jury trial, De La Rosa, along with her attorney and the State, would pick a 12-person jury that would have to "unanimously" find her guilty beyond a reasonable doubt. A commonsense understanding of the trial court's statement would be that if De La Rosa did not choose a jury, a jury would not determine her guilt. Additionally, the jury waiver signed by De La Rosa stated that she "waive[d] jury trial and submit[ed] the *** cause to the [c]ourt for hearing." In other words, the case was to be heard by the trial court rather than a jury.

¶ 36    Ultimately, however, the trial court is not required to recite specific admonishments before allowing a defendant to waive the right to a jury trial (*Bannister*, 232 Ill. 2d at 66), and the dispositive question is whether De La Rosa understood that her trial would be decided by the trial court rather than a jury (*Reed*, 2016 IL App (1st) 140498, ¶ 7). The record establishes that the trial court ensured that De La Rosa knew that her case would be decided by the court rather than a jury, fulfilling the trial court's duty to obtain a knowing and voluntary waiver.

¶ 37    Moreover, De La Rosa's prior interactions with the justice system, including one felony conviction and multiple misdemeanor convictions, further supports the conclusion that her jury waiver was knowing and voluntary. De La Rosa has therefore failed to establish that her jury waiver was invalid. *Id*. As the trial court did not err, there can be no plain error (*Eppinger*, 2013 IL 114121, ¶ 19), and De La Rosa's argument fails.

¶ 38    De La Rosa next contends that she was denied effective assistance when defense counsel used the body camera footage. She argues that the video contained inadmissible hearsay statements and other-crimes evidence that "bolstered" the State's case "when the evidence of guilt was closely balanced."

¶ 39    Ineffective assistance claims are evaluated under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, a defendant must demonstrate that (1) defense counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that the result of the proceeding would have been different absent counsel's deficient performance. *People v. Jackson*, 2020 IL 124112, ¶ 90. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 40    Defense counsel has wide latitude in making tactical decisions, and there is a presumption that counsel's conduct reflected sound trial strategy. *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). This court is highly deferential of defense counsel's performance. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 38. We use this deferential standard because "[t]here are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. The failure to satisfy either *Strickland* prong is fatal to a defendant's claim. *Jackson*, 2020 IL 124112, ¶ 90.

¶ 41    Here, De La Rosa alleges that she was denied effective assistance by defense counsel's decision to use the body camera footage, as it contained inadmissible hearsay statements—including a statement that De La Rosa hit other students and the declarant—that bolstered the State's case. She further argues that the Law Enforcement Officer-Worn Body Camera Act (Act) (50 ILCS 706/10-1 *et seq*. (West 2018)) does not override the rules of evidence governing hearsay. See *People v. Andrade*, 2021 IL App (2d) 190797-U, ¶ 23 ("nothing in this section manifests an intent to override the normal rules of evidence regarding relevancy and hearsay"); see also Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (nonprecedential Appellate Court orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 42    The Act is intended to "provide impartial evidence and documentation to settle disputes and allegations of officer misconduct." 50 ILCS 706/10-5 (West 2018). With limited exceptions,

the Act requires officers to activate their cameras when "engaged in any law enforcement-related encounter or activity, that occurs while the officer is on duty." *Id.* § 10-20(a)(3). " 'Law enforcement-related encounters or activities' include, but are not limited to, traffic stops, *** arrests, searches, interrogations, investigations, *** or any other instance in which the officer is enforcing the laws of the municipality, county, or State." *Id.* § 10-10. Pertinent to the dispute before us, section 10-30 states that "recordings may be used as evidence in any administrative, judicial, legislative, or disciplinary proceeding." *Id.* § 10-30.

¶ 43    Hearsay denotes a statement made by an out-of-court declarant that is offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay evidence is generally inadmissible, subject to certain exceptions. *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 23; see also Ill. R. Evid. 802 (eff. Jan. 1, 2011). However, "testimony about an out-of-court statement which is used for a purpose other than to prove the truth of the matter asserted in the statement is not "hearsay.' " *People v. Williams*, 181 Ill. 2d 297, 313 (1998) (quoting *People v. Simms*, 143 Ill. 2d 154, 173 (1991)).

¶ 44    This court has previously held that the plain language of the Act permits the trial court to exclude body-worn camera recordings "where appropriate" and does not include an express exception to the Rules of Evidence. See *People v. Collins*, 2020 IL App (1st) 181746, ¶¶ 24, 27, *appeal dismissed*, 2022 IL 127584 (finding that the General Assembly "did not intend limitless admission of body-worn camera video").

¶ 45    As an initial matter, the parties dispute the admissibility of the body camera footage and whether the statements therein are hearsay. However, these arguments were not made before the trial court. Further, these arguments overlook several key points. First, as discussed, the audio is poor and there is constant screaming and background noise. This court reviewed the footage

several times and did not hear several of the complained-of statements recited in De La Rosa's brief. Second, defense counsel did not offer the video for the truth of the matters asserted in the statements that were audible in the footage. Rather, defense counsel offered the video to establish the chaotic nature of the incident and that A.P.'s demeanor rendered A.P.'s identification of De La Rosa as the person who struck her incredible. In other words, trial counsel sought to cast A.P. as an unreliable narrator of the night's events.

¶ 46    Ultimately, De La Rosa's argument, as detailed in her reply brief, is that she was denied effective assistance by defense counsel's failure to redact "the objectionable statements from the video." She asserts that absent the admission of the unredacted footage, a reasonable likelihood exists that the trial court would have found her not guilty.

¶ 47    Decisions concerning what evidence to present at trial are considered matters of trial strategy that are generally immune from ineffective assistance claims. *People v. West*, 187 Ill. 2d 418, 432 (1999). Here, defense counsel used the body camera footage to emphasize the chaotic nature of that night and attack A.P.'s identification of De La Rosa as the person who struck her. Indeed, defense counsel argued during closing argument that the actions of others were imputed to De La Rosa, who was arrested in error. The mere fact that defense counsel's strategy was unsuccessful does not mean that defense counsel was deficient. A strategy must be more than unsuccessful to support a *Strickland* claim, and "must appear irrational and unreasonable in light of the circumstances that defense counsel confronted at the time." *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997).

¶ 48    Here, it was not irrational for defense counsel to attempt to show the chaotic nature of events and attack A.P.'s credibility. Even if this strategy appears in retrospect to be erroneous, this would not render counsel's representation constitutionally deficient. *People v. Palmer*, 162 Ill. 2d

465, 479-80 (1994) (an error in "judgment or trial strategy" does not establish incompetence, and trial performance should not be "judged by a hindsight perspective"). Defense counsel could reasonably have decided that the body camera footage, which depicts numerous people screaming and an incoherent A.P., would have helped the defense theory that De La Rosa did not strike her.

¶ 49　Even if we were to agree with De La Rosa that defense counsel was deficient, she still fails to establish prejudice. The trial court expressly found De La Rosa and her daughter to be incredible witnesses. Contrary to De La Rosa's argument on appeal that the trial court found her incredible because the footage showed that De La Rosa was present after being told to leave, the footage corroborated De La Rosa's own testimony that she did not leave. Additionally, as the trial court noted, the footage did not depict the alleged interaction between A.P. and De La Rosa, only the aftermath.

¶ 50　In finding De La Rosa guilty, the trial court specifically rejected De La Rosa's explanation for her presence on the field and her assertion that she was struck first, and found the testimony of De La Rosa and her daughter incredible. "[W]hen a trial court is the trier of fact a reviewing court presumes that the trial court considered only admissible evidence and disregarded inadmissible evidence in reaching its conclusion." *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). Thus, even if, as De La Rosa claims, the body camera footage contained hearsay statements, we presume the trial court did not consider them. See, *e.g.*, *People v. Howery*, 178 Ill. 2d 1, 32 (1997) (the court is presumed to know the law and apply it correctly). Because De La Rosa has failed to establish a reasonable likelihood that, without the body camera footage, the trial court would have found her not guilty, her ineffective assistance claim fails.

¶ 51　　　　　　　　　　　　III. CONCLUSION

¶ 52　For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 53    Affirmed.